UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 21-cr-702 (JEB) |
| v. : | |
| : | |
| LOUIS VALENTIN, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Louis Valentin to 30 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

**I.    Introduction**

Valentin, a 37-year-old Uber driver, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Valentin pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because Valentin, along with co-

---

[1] Although the Statement of Offense in this matter, filed on February 16, 2023, (ECF No. 43 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

defendant Baquero, entered the Capitol through the Upper West Terrace Door, hearing the piercing sound of the security alarm, and past the signs that read "Emergency Exit." He climbed the steps to the Rotunda and walked around the Capitol for about 10 minutes before returning to the Rotunda. Valentin stayed in the Rotunda for approximately 37 minutes, watching as rioters, including Baquero, violently confronted police. When later interviewed by the FBI, Valentin minimized his conduct, claiming that he did not think there was anything wrong with going inside the Capitol, and denying that he saw violence in the Rotunda.

The Court must also consider that Valentin's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol building, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Valentin's participation in a riot that succeeded in halting the Congressional certification supports a sentence of 30 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

**II.     Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 43 (Statement of Offense), at 1-7.

*Valentin's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Valentin traveled from his home in Florida to Washington, D.C., with co-defendant Baquero. After attending the rally, Valentin and Baquero walked to the Capitol, and crossed fallen barricades, past rioters engaging with police, to enter the Capitol Grounds (ECF 43,

¶ 9). They arrived on the west side of the Capitol and climbed under the scaffolding set up for the Inauguration.

Valentin and Baquero climbed the Northwest steps to the Upper West Terrace. At about 2:45 p.m., Baquero, and then Valentin entered the Capitol through the Upper West Terrace Door. *See* Exhibit 3.[2]



*Figure 1: Screenshot from Ex. 3 at 0:08*

As Valentin entered, it was obvious to him that this was not an approved entrance to the Capitol. He heard a piercing security alarm, saw cardboard boxes stacked on either side of the hallway, and passed signs reading, "Emergency Exit Only. PUSH UNTIL ALARM SOUNDS." *See* Exhibit 4.[3]

---

[2] The government will submit a consolidated set of exhibits for both Valentin and Baquero.
[3] Exhibit 4 is cellphone video taken by another rioter entering at the Upper West Terrace Door around the time of Valentin's and Baquero's entrance.



*Figure 2: Screenshot from Exhibit 4 at 0:07, with close-up*

After entering the building, Valentin and Baquero climbed a set of steps to the Rotunda, recording the scene with their cellphones.



*Figure 3: Screenshot from CCTV at approximately 2:46 p.m.*

Valentin and Baquero exited through the north entrance of the Rotunda, towards the Senate side of the building. Rioters' progress along this path to the Senate was successfully blocked by police. Valentin and Baquero returned to the Rotunda about 10 minutes later. *See* Exhibit 5.



*Figure 4: Screenshot from Ex. 5 at 0:15.*

At approximately 3:01 p.m., Valentin and Baquero saw a confrontation between rioters and police at the West entrance to the Rotunda. They moved towards the confrontation, and Valentin (indicated in red) watched as Baquero (indicated in green) joined the rioters pushing against police. *See* Ex. 5, at 0:35



*Figure 5: Screenshot from Exhibit 5 at 0:35*

After Baquero was pushed back by police, Valentin and Baquero stood together near the west entrance, as additional police entered the Rotunda in preparation for a joint effort to push rioters out of the room. *See* Ex. 5 at 2:18. As the officers moved forward, rioters began physically

5

resisting. Valentin (red arrow) watched as Baquero (green arrow) joined the rioters confronting police. *See* Ex. 5 at 3:11 – 3:50.



*Figure 6: Screenshot from Exhibit 5 at 3:29*

After Baquero's second confrontation, he rejoined Valentin. Despite instructions from the police to leave, Baquero and Valentin remained in the Rotunda, moving back only when forced to by the advancing line of police. *See* Exhibit 9.  Eventually, Baquero and Valentin moved towards the outer perimeter of the Rotunda, watching other rioters' confrontations with police. *See Id.*



*Figure 7: Screenshot from Exhibit 9 at 0:19*

The police continued to pushed rioters out of the Rotunda through the east entrance, out to the lobby outside the Rotunda. Valentin and Baquero stayed on the perimeter, watching other rioters, but not attempting to leave. *See* Ex. 10 at 0:45 – 0:50. When the police line finally got to them, Baquero and Valentin exited through the east entrance, among the last rioters to leave the Rotunda.

But rather than continue to the East Rotunda Door to exit the Capitol building, Baquero and Valentin remained in the lobby, just outside the east entrance of the Rotunda, for several minutes. *See* Exhibit 11.



*Figure 8: Screenshot from Ex. 11 at 0:42*

At about 3:19 p.m., Baquero ran towards the door, intent on stopping the police from closing the east entrance. *See* Exhibit 12 at 0:40. Once again, Valentin watched as Baquero physically confronted police. *Id*. at 0:44 - 1:00.





*Figures 9 and 10: Screenshots from Exhibit 12 at 0:57, 0:59*

After Baquero was pulled away from the door by police, he moved away and sat on a nearby bench. *See* Exhibit 14, at 0:35 - 0:45 (indicated in green). Valentin walked around the lobby, continuing to watch the officers' efforts to clear the Rotunda. *See* Ex. 14 at 1:08 (indicated in red).

8



*Figure 11: Screenshot from Ex. 14 at 1:08*

At approximately 3:22 p.m., a surge of rioters broke through the East Rotunda Door, and Valentin was pushed towards a nearby staircase. *See* Ex. 14 at 1:42. He watched as rioters streamed through the East Rotunda Door and towards the Rotunda. Even though he had the ability to leave, Valentin remained in the lobby, watching the new influx of rioters confront police. *Id*. at 2:13 – 3:38. When it became clear the police had gained the upper hand and were clearing the lobby, Valentin moved towards the exit, leaving the building at approximately 3:22 p.m., and having been inside for almost 40 minutes. *Id*. at 3:48 – 4:09.

Though he left the building, Valentin still did not leave the Capitol Grounds. He remained on the steps outside the Columbus Door, rejoined Baquero, and took video of the rioters as he and Baquero walked around.



*Figure 12: Screenshot from video taken by Valentin*

*Defendant's FBI Interview*

On March 26, 2021, Valentin voluntarily agreed to speak with the FBI. He admitted he travelled to Washington, D.C. with Baquero, attended the former President's "Stop the Steal" rally, and then walked to the Capitol. Valentin minimized his conduct, suggesting that he was only in the Capitol for 10 minutes, claimed that he didn't think there was anything wrong with going inside the Capitol, and that the doors were open and people "walked right inside." Valentin said he did not recall seeing any police, and claimed that the only violence he witnessed was a group of people allegedly trying to stop an individual from breaking a Capitol window. Valentin denied taking any video or photos inside the Capitol, but voluntarily provided cellphone videos taken outside of the Capitol.

Baquero agreed to speak with the FBI on April 12, 2021. Baquero said that once inside the Capitol, he told Valentin "This feels like a trap" because not many people entered behind them. Baquero (who was with Valentin the entire time they were inside and outside the Capitol building) said he saw a rioter trying to kick down a door and another trying to hand out a fire extinguisher to him and others. Baquero also said that once inside the Rotunda, Valentin told Baquero he had seen someone with a knife.

*The Charges and Plea Agreement*

On October 28, 2021, the United States charged Valentin by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D) and (G). On October 29, 2021, law enforcement officers arrested him at his home in Florida. On December 1, 2021, the United States charged Valentin by Indictment with violating the same four misdemeanor statutes.[4] On February 16, 2023, pursuant to a plea agreement, Valentin pleaded guilty to Count Six of the Indictment, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Valentin now faces a sentencing on a single count of violating 40 U.S.C. § 5104. As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

---

[4] Baquero was charged with two felony counts in the same Indictment.

11

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Valentin's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Valentin, the absence of violent or destructive acts is not a mitigating factor. Had Valentin engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in Valentin's case is the manner in which he entered the Capitol. Contrary to his later statements to the FBI, Valentin was under no illusion that his entry to the Capitol was permitted. The emergency exit signs, piercing alarm, and stacks of boxes made it obvious to Valentin that he was not legitimately entering into one of the most important buildings in the country. Moreover, if Baquero's voluntary statement was accurate, Valentin saw rioters kicking in doors and trying to hand out fire extinguishers, and Valentin saw a rioter with a knife inside the Rotunda.

While in the Capitol, Valentin watched as rioters, including Baquero, repeatedly attacked police. Instead leaving, he stayed to watch the action, and made no effort to restrain Baquero. He and Baquero were reluctant to leave the Rotunda, even after they were aware police were clearing the room. And instead of leaving the building once he got to the Rotunda lobby, he remained inside until he had no choice but to leave. In total, Valentin remained inside the Capitol for almost 40 minutes, far longer than many other misdemeanor defendants.

Though he admitted certain facts to the FBI, he also significantly minimized his conduct, falsely claiming that he didn't think there was anything wrong with going inside the Capitol, never came into contact with police, and claimed that the only violence he witnessed was rioters "protecting" the Capitol.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Valentin's History and Characteristics

Valentin has no criminal history. Apart from positive urine tests, he has been compliant with the terms of his supervised release.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Valentin's lack of remorse is demonstrated by the fact that months later, when interviewed by the FBI, Valentin minimized his conduct and falsely suggested that his occupation of the Capitol had been peaceful and legitimate political activity. Moreover, while some January 6 defendants pled guilty promptly, Valentin did not accept responsibility for his actions for over a year after his arrest. The government submits that this conduct is a better indicator of the need for deterrence than any assurances Valentin may make now that he is facing sentencing.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Valentin based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Valentin has pleaded guilty to Count Six of the Indictment, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a)

16

factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71

17

(ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pleaded guilty to misdemeanor charges of violating 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. This Court sentenced the defendants each to 45 days of incarceration.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pleaded guilty to a misdemeanor charge of violating 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing. Nevertheless, Judge Chutkan sentenced *Mazzocco* to 45 days of incarceration.

In *United States v. Charles Pham,* No. 21-cr-109 (TJK), the defendant pleaded guilty to the misdemeanor charge of violating 40 U.S.C. § 5104(e)(2)(G). Pham, an active-duty police officer, entered the Capitol, saw confrontations between rioters and police, and was inside the

building for approximately 20 minutes. Pham also downplayed his conduct to the FBI. Judge Kelly imposed a sentence of 45 days' imprisonment.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[6]

---

[6] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple

19

V.   **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   *Robert Juman*
Robert Juman
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov

---

intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.